Filed 5/20/16  P. v. Sims CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>  v.<br><br>WALTER EARL SIMS,<br><br>    Defendant and Appellant. | C079546<br><br>(Super. Ct. No. 14F03728) |

Despite inconsistencies between an arresting officer's police report, the in-car camera audio, and his testimony at the hearing on defendant Walter Earl Sims's motion to suppress, the trial court found credible the officer's testimony that defendant gave a general consent to search his house, which included a locked safe, and denied the motion. We must defer to the trial court's findings of fact where, as here, they are supported by substantial evidence.  (*People v. Lomax* (2010) 49 Cal.4th 530, 563.)  We therefore affirm the trial court's denial of the Penal Code section 1538.5 motion to suppress the evidence of drugs and weapons seized during a search of defendant's house.

1

## SUBSTANTIAL EVIDENCE AT THE SECTION 1538.5 HEARING

Sergeant Michael Lange testified over two days at the Penal Code section 1538.5 hearing, and his testimony formed the basis of the trial court's ruling. He testified that he and several other officers from the Sacramento Police Department, aware of an outstanding felony arrest warrant for defendant, parked outside of his home and watched. He intended to obtain defendant's consent for a search of the house. He knocked on the door and identified defendant as an occupant. Defendant's girlfriend opened the door and defendant was arrested without incident.

While walking to the police car parked 75 to 100 yards down the street, Officer Lange asked defendant if he had anything illegal in the house. When defendant responded that he did not, Officer Lange asked him if he minded if he searched the house. Defendant replied, "Go ahead." He was handcuffed and put in the patrol car. An audiotape recorded their conversation in the car. As the tape begins, defendant is asking the officer to retrieve his cell phone from his bedroom. In the meantime, another officer obtained the girlfriend's consent to perform a protective sweep of the house.

In the southeast bedroom, Sergeant Lange found "evidence of marijuana" and "four .45-caliber rounds of live ammunition, as well as some other jars and packaging for marijuana type residue and sales." Other officers found ammunition in the garage. Lange found a locked safe in the bedroom closet, partially covered with a blanket or jacket. As he walked back into the living room, he observed keys on top of the girlfriend's open purse. She denied the keys were hers and did not consent to a search of the safe. One of the keys appeared to be a key to the safe. Another officer determined that two of the other keys fit defendant's cars.

Satisfied that the keys belonged to defendant, Officer Lange opened the safe and observed a Colt style M-16 assault rifle, handgun, large amount of money, and packaging that appeared to contain methamphetamine. He returned to the patrol car and asked defendant if the safe was his. He could not remember if defendant claimed the safe

belonged to a friend. Defendant denied permission to search it. Officer Lange thereafter obtained a warrant to continue his search of the safe. A subsequent search revealed that the safe contained $595 in cash and 23.23 grams of methamphetamine.

The trial court denied the motion to suppress. The court explained: "When this Court looks at the totality of the facts in this case, the Court finds that the officer had general consent that was voluntarily given by the defendant, that the officer found the keys in the purse of what appeared to be another resident who disclaimed any knowledge of those keys. A reasonable inference would be that those keys (A) fit the safe and (B) that the safe was probably -- it probably belonged to the defendant. [¶] . . . [¶]

"And so I do believe that, operating on the defendant's consent, the officer was legally authorized to use the keys to open the safe. Once the defendant denied -- withdrew his consent, the officer no longer had permission to open the door of the safe and the officer did what he should have [done] and that is seized the safe and booked it into evidence to get a warrant. [¶] . . . [¶]

"So in summary, based on the totality of the officer's testimony, the Court finds that the officer was credible and that the defendant did give consent and that consent authorized the officer to look into the safe with the keys that had been abandoned by the other occupant of the house. Therefore this motion to suppress is denied under [Penal Code section] 1538.5[, subdivision] (a)."

## DISCUSSION

### *Consent to Search?*

The Fourth Amendment to the United States Constitution prohibits all unreasonable searches and seizures. (*People v. Ramirez* (2007) 148 Cal.App.4th 1464, 1468.) A search conducted without a warrant is presumptively unconstitutional unless the defendant consented to the search. (*People v. Woods* (1999) 21 Cal.4th 668, 674.) This case turns on whether defendant consented to a search of his house and, if so, whether the scope of his consent encompassed the locked safe in his closet. The only

3

evidence of consent is Sergeant Lange's testimony. The purported consent was not captured on the audiotape in the car, and Sergeant Lange did not obtain a written consent to search on a form sometimes utilized for this purpose.

Defendant argues on appeal, as he did before the trial court, that Sergeant Lange's testimony was inconsistent with his written report and with the audiotape recording of his conversation with defendant. He maintains that the sergeant's inconsistencies bolster the defense position that he had not obtained the consent that he testified he had. In short, defendant insists the sergeant's testimony was not to be believed.

In his closing argument at the motion to suppress hearing, defendant laboriously described those inconsistencies. For example, defense counsel pointed out the inconsistencies in Lange's testimony about a conversation he had with defendant regarding his cell phone. Defense counsel argued: "The officer testified first on direct examination that he had a conversation with Mr. Sims regarding the phone, that Mr. Sims specifically told him that he needed the officer to get him his phone, that he wanted to get some numbers out of his phone, that the phone was in the master bedroom. And that the phone was on the nightstand. Those are four facts that we know did not occur and was [*sic*] not part of the conversation because the officer's own testimony today was that there was only one conversation on the phone and that conversation is captured by the in-car camera.

"And that in-car camera conversation does not mention anything about Mr. Sims saying that the phone is on a nightstand, Mr. Sims saying anything about the phone being in a back bedroom, nor does it say anything about Mr. Sims wanting to get some numbers off the phone. It is simply Mr. Sims saying, 'Hey, there is a phone on the bed.' And the officer saying, 'Do you want me to get that for you?' And Mr. Sims says, 'Yes.'

"How the officer testified regarding the conversation with the phone is consistent with how he testified -- I'm sorry, what he wrote in his police report, but it is not consistent with the actual conversation that was recorded.

4

"Defense is concerned that because of these inconsistencies this Court should be careful in accepting the officer's testimony as to exactly what happened and the conversations that he had with Mr. Sims."

Similarly, Sergeant Lange testified initially that defendant's girlfriend consented to a search of the entire house, but on cross-examination, he admitted that she had only given consent for a protective sweep. Defense counsel labeled the sergeant's inconsistency as a "red flag."

During cross-examination, defense counsel asked Lange why, if he had already obtained consent to search the house, he subsequently asked defendant for permission to search the safe. And Lange responded that he was merely attempting to establish ownership of the safe. Defense counsel later argued: "But once I confronted him and impeached him on the in-car camera where he clearly asked Mr. Sims whether he could have permission to open the safe and clearly asked Mr. Sims whether he has permission to look into the safe, then he started back-pedaling again. But his first testimony, Your Honor, was that he never asked Mr. Sims that because he didn't have to. But we know he asked him and he eventually was impeached on the in-car camera that he in fact asked him. And he asked him for permission because he knows he didn't have permission to look into that safe."

Defense counsel insisted that Sergeant Lange went to defendant's house with the intention to arrest him and search the house. When defendant asked the sergeant on the audiotape, "Hey, what are you doing in my house," Lange did not say it was because defendant had given his consent, but rather that he had the right to "search and arrest you." Because, in defendant's view, Lange had not obtained his consent, he did not have the right to search. The inconsistencies in the sergeant's testimony, he concludes, make it abundantly clear that he did not have the right to search and indeed had violated defendant's Fourth Amendment right to be free of unlawful searches and seizures.

The trial court acknowledged the inconsistencies, big and small. Nevertheless, the court found Sergeant Lange's testimony credible. The court explained: "Under withering cross-examination, although kind I would say but certainly aggressive cross-examination, the officer did have some inconsistencies in his statement. But he did testify sincerely in this Court's opinion that because it had been eight months he did not wish to guess or enter into any conjecture about the specific words he used without reading the transcript. Which was not provided to him either before court or during court. So his answers were vague. And he did explain that vagary [*sic*] to the Court's satisfaction by saying he did not want to deny saying something when he didn't remember it. And the specifics of what someone said eight months earlier I would not necessarily expect the officer to remember every single word that was spoken back and forth.

"He did not ever shrink from the contention that the defendant gave him consent to search, that that was his object. It was clear to the Court that the officer went to the home with the intent to procure consent to search. That was a consistent theme in his testimony and that was consistent with what he told the defendant in the police car on the way to jail, it is consistent with the way he testified in that he told -- asked the defendant first if he had anything that was illegal in the house and then when the defendant denied that he did, he asked him if he would mind if the officers looked around to confirm that. That is not unusual in this Court's experience and it does not raise a red flag."

Like the trial court, we have carefully considered the alleged inconsistencies in Sergeant Lange's testimony. But unlike the trial court, we are not at liberty to assess his credibility. We must affirm the trial court's factual findings if they are supported by substantial evidence, and credibility determinations are for the trial court to make. (*People v. Hughes* (2002) 27 Cal.4th 287, 327; *People v. Hughes* (1960) 183 Cal.App.2d 107, 112.)

6

The trial court found Sergeant Lange credible and sincere. It acknowledged the inconsistencies in his testimony but found they were either understandable because of the passage of time and the fact he had not reviewed the transcript of the audio recording or insignificant because many of the inconsistencies turned on semantics. It is true that six months had passed and that he testified, "I haven't reviewed the in-car camera. I'm not going to know my exact words."[1] There was also confusion over precisely who obtained consent to conduct a protective sweep and how and when the consent to search was obtained. Lange discounted defense counsel's accusations that his testimony differed from his written report in that regard. The court recognized, "The fact that legal terms of art are often bantered about in an incorrect context, whether or not Officer Hanson thought he had legal authority to conduct a protective [sweep] or even if Sergeant Lange thought he had the legal authority to conduct a protective sweep and whether or not they were both incorrect, the fact remains that Sergeant Lange got consent to search in the general terms from the defendant." We agree with the Attorney General that there is ample evidence to support the trial court's factual finding that defendant consented to a search of his house based on the testimony of Sergeant Lange and the trial court's assessment of his credibility.

***Scope of Consent to Search?***

Defendant contends that even if we affirm the trial court's finding he consented to a search for illegal items in the house, the search of a locked safe exceeded the scope of his consent. "A consensual search may not legally exceed the scope of the consent supporting it." (*People v. Crenshaw* (1992) 9 Cal.App.4th 1403, 1408.) Defendant finds support in *State v. Wells* (Fla. 1989) 539 So.2d 464 (*Wells*), wherein the Florida Supreme Court held that the consent to search the trunk of a car did not encompass consent to

_____

[1] Although the trial court stated eight months had passed between the search and Sergeant Lange's testimony at the suppression hearing, it had, in fact, been six months.

7

search a locked suitcase therein, and *People v. Cantor* (2007) 149 Cal.App.4th 961 (*Cantor*), wherein the Court of Appeal found that consent to a "real quick" check of a car for anything illegal did not mean the defendant had consented to the removal with a screwdriver of the back panel of a record cleaner and a search of the equipment. These cases are distinguishable.

The trial court emphasized that the visibility of the key distinguishes this case from those cited by defendant. Whereas in *Wells* the police officers pried open the lock with a knife to get into the suitcase, here Sergeant Lange saw a set of keys sitting in plain view on top of defendant's girlfriend's purse. One of the keys looked like a key to a safe, and given that two of the other keys had been confirmed to be keys to defendant's cars, he believed the safe belonged to defendant, who had given his consent to search for anything illegal. Nor was using a visible key to open the safe equivalent to taking a screwdriver to remove the back panel of the record cleaner the defendant in *Cantor* had stashed in the trunk of his car. In both cases, the courts concluded the police officers' intrusive and invasive conduct far exceeded the reasonable expectations of the suspects when they gave consent to search.

Indeed, the United States Supreme Court, in a similar case, rejected an analogy to *Wells*. (*Florida v. Jimeno* (1991) 500 U.S. 248 [114 L.Ed.2d 297] (*Jimeno*).) The court wrote: "The facts of this case are therefore different from those in *State* v. *Wells*, *supra*, [539 So.2d 464] on which the Supreme Court of Florida relied in affirming the suppression order in this case. There the Supreme Court of Florida held that consent to search the trunk of a car did not include authorization to pry open a locked briefcase found inside the trunk. It is very likely unreasonable to think that a suspect, by consenting to the search of his trunk, has agreed to the breaking open of a locked briefcase within the trunk, but it is otherwise with respect to a closed paper bag." (*Jimeno*, at pp. 251-252.) The court reiterated the guiding principle: "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of

'objective' reasonableness -- what would the typical reasonable person have understood by the exchange between the officer and the suspect? [Citations.] The question before us, then, is whether it is reasonable for an officer to consider a suspect's general consent to a search of his car to include consent to examine a paper bag lying on the floor of the car. We think that it is." (*Id*. at p. 251.)

Similarly, we agree with the trial court that Sergeant Lange did not exceed the scope of the consent defendant gave to search for anything illegal when he used a key he saw in plain sight to open the safe. The search of the safe, like the search of the bag in *Jimeno*, was objectively reasonable. Moreover, once defendant withdrew his consent by denying the sergeant's request to search the safe, Sergeant Lange seized the safe and searched it only after securing a warrant. His conduct bears no resemblance to the conduct of law enforcement in *Wells* and *Cantor*.

In short, we conclude that defendant had no reasonable expectation of privacy once he gave the police his consent to search for anything illegal in the house and left keys readily accessible to his safe and cars. Because Sergeant Lange did not exceed the scope of defendant's consent to search as a matter of law, the trial court's denial of the motion to suppress the contents of the safe is affirmed.

## DISPOSITION

The judgment is affirmed.

<u>     RAYE     </u>, P. J.

We concur:


<u>   HULL    </u>, J.



<u>   MURRAY   </u>, J.

9